UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| NORTH MIAMI BEACH GENERAL EMPLOYEES RETIREMENT FUND and JULIE WEINTRAUB, | : : : : | CASE NUMBER: 10-cv-6514 |
| Plaintiffs, | : : | VERIFIED STOCKHOLDERS' DERIVATIVE COMPLAINT |
| vs. | : : | |
| ROBERT L. PARKINSON, BLAKE E. DEVITT, JOHN D. FORSYTH, GAIL D. FOSLER, CAROLE J. SHAPAZIAN, DR. WAYNE T. HOCKMEYER, DR. JOSEPH B. MARTIN, THOMAS T. STALLKAMP, ALBERT P.L. STROUCKEN, WALTER E. BOOMER, DR. JAMES R. GAVIN III, PETER S. HELLMAN, K.J. STORM, and PETER J. ARDUINI, | : : : : : : : : : : : | JURY TRIAL DEMANDED |
| Defendants, | : : | |
| -and- | : : | |
| BAXTER INTERNATIONAL INC., | : : | |
| Nominal Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## INTRODUCTION AND OVERVIEW OF THE ACTION

1.      This is a stockholders' derivative action brought on behalf of and for the benefit

of Baxter International Inc. ("Baxter" or the "Company") against Baxter's Board of Directors

(the "Director Defendants"), and certain executives, for breaches of fiduciary duty arising from

their gross and reckless mismanagement, and acts of corporate waste, in connection with

Baxter's violations of federal laws and regulations governing its business activities.   The

Director Defendants caused or allowed Baxter to engage in repeated and persistent violations of federal current good manufacturing practices ("CGMP") of the United States Food and Drug Administration ("FDA") and the Quality System Regulation ("QS") with respect to the manufacturing and distribution within the United States of its Colleague Volumetric Infusion Pump ("Colleague") and the Syndeo Patient Controlled Analgesic Syringe Pump ("Syndeo") (collectively, the "Pumps"), two infusion pumps that control the delivery of solutions and medications, either intravenously or otherwise, to patients in a continuous or intermittent manner. These violations began at least as far back as 1999, and continued in the face of repeated communications from the FDA requesting that action be taken to correct these violations. The Company eventually agreed, among other things, to take necessary measures to ensure compliance with the CGMP and QS requirements on or about June 29, 2006, when the FDA filed in this Court a Complaint for a Consent Decree for Condemnation and Permanent Injunction ("Consent Decree") against Baxter Healthcare Corporation, a wholly-owned subsidiary of Baxter, defendants Robert L. Parkinson, Jr. ("Parkinson") and Peter J. Arduini ("Arduini"), Baxter's Corporate Vice President and President of Medication Delivery Services. Specifically, by entering into the Consent Decree with the federal government, Baxter agreed, among other things, not to manufacture or distribute any new Colleague and Syndeo pumps within the United States until it corrected manufacturing deficiencies and until the devices were manufactured in compliance with the FDA's CGMP and QS regulations for these devices. The Company further agreed to work with the FDA on a remediation plan to correct the deficiencies of the Colleague and Syndeo Pumps still in operation.

2.	Prior to entry of the Consent Decree, the Director Defendants were aware of the numerous problems concerning the manufacture and distribution of the Pumps. For example,

2

following inspections at the Company's Round Lake, Illinois facility, where the Pumps are manufactured, the FDA on September 16, 1999 issued a Warning Letter to address the Company's failure, among other things, to establish adequate corrective and preventive action procedures (CAPA), and on August 21, 2001, issued another Warning Letter which, among other things, again noted Baxter's failure to establish and maintain CAPA procedures.

3.     In addition to sending the Warning Letters, the FDA conducted several additional inspections of Baxter's medication delivery systems facility in Round Lake. These inspections, such as those that took place in September 2000 and June 2002, revealed a lack of management controls over the Company's quality system operations and inadequate CAPA procedures and complaint handling systems. According to the FDA, these deficiencies undermined Baxter's ability to assure the quality of the devices manufactures at its Singapore plant. In June 2005, FDA inspections revealed deficiencies with the CGMP and QS requirements for devices manufactured at the Round Lake Facility. The inspection also revealed that Baxter had failed to implement adequate management controls over its quality operations and CAPA procedures. During this inspection, the FDA found that there were design defects relating to the reliability of both the Colleague and Syndeo Pumps. It was during the course of the FDA's June 2005 inspection that Baxter initiated a voluntary worldwide hold on all Colleague and Syndeo Pumps due to various design defects.

4.     On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that it did not plan to begin the latest round of corrections to the adulterated and misbranded Pumps until May 2012 and that it did not anticipate completion of the proposed corrections until 2013. The FDA found this proposed schedule unacceptable. Thus, under the terms of the Consent Decree, on May 3, 2010, the FDA announced in a press release that it had

sent a letter to Baxter on April 30, 2010, ordering the Company to recall and destroy all of its Colleague Pumps currently used in the U.S., reimburse its customers for the value of the recalled device, and assist customers in finding a replacement product. According to the FDA, such action was taken due to "a long standing failure to correct many serious problems with the pumps." On May 3, 2010, the Company announced that it would recall all Colleague pumps from the U.S. market.

5.      The Director Defendants failed to take necessary corrective measures, despite their knowledge of the serious, long-standing problems relating to the Pumps' compliance with the FDA's CGMP and QS regulations and despite the Consent Decree, in which Baxter agreed that it would, among other requirements, submit an acceptable detailed corrective action plan to bring the Colleague and Syndeo pumps into compliance under federal law.

6.      During the eleven year period of wrongdoing, which began with the September 16, 1999 Warning Letter (the "Relevant Period"), the Director Defendants also caused numerous filings to be made with the Securities and Exchange Commission ("SEC"), which concealed from the investing public the violations of federal quality standards and the consequent risks to Baxter. Baxter and defendant Parkinson also have been named as defendants in a class action lawsuit alleging violations of the federal securities laws by reason of these misleading statements, which will cause Baxter and its shareholders additional injury and damages.

7.      The Director Defendants dereliction of their duties and grossly reckless mismanagement has been disastrous for Baxter and Baxter's shareholders. Baxter's shareholder equity and its common stock market capitalization have plunged as a result of the Company's illegal conduct.

8.      Additionally, as a result of the Company's recall of the Colleague Pumps in the

U.S., and its violations of the terms of the Consent Decree, Baxter recorded a pre-tax special charge of $588 million in the first quarter for the reasonably estimate cost of the recall, in addition to lost revenue from the sale of new pumps. This amount is in addition to the $337 million in prior charges - $27 million in 2009, $125 million in 2008, $14 million in 2007, $94 million in 2006, and $77 million in 2005 – the Company took relating to the Colleague and Syndeo pumps issues.

9.    While Baxter has suffered hundreds of millions of dollars in damages and will continue to suffer further huge losses by reason of the conduct complained of, Baxter's executives have received millions of dollars in improper and wasteful annual incentive bonuses and other stock options and awards. These bonuses were inflated because Baxter's financial results, upon which they were calculated, were artificially inflated by failing to properly account for the financial impact of Baxter's failure to comply with the Consent Decree. At the same time, the Director Defendants have been elected and re-elected to their positions of power, prestige and profit by means of false and misleading statements in the Company's SEC filings and received millions of dollars of compensation by unjust payments and stock awards.

10.    The Director Defendants owed the Company and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty. They were required to oversee Baxter's affairs in a fair, just and equitable manner to prevent violation of laws, to act in furtherance of the best interests of Baxter and its stockholders, and not to act in furtherance of their own personal interests. In addition, each of the Director Defendants owed Baxter the duty to exercise due care and diligence in the management and administration of the Company's affairs and in the use and preservation of its property and assets. In violation of their fiduciary duties, the Director Defendants permitted the Company to conduct its business in an unsafe, imprudent and

dangerous manner by pursuing unsound and illegal practices, including those specified in this Complaint, thereby wasting its assets.

11.     The conduct of the Director Defendants complained of herein involved a knowing and culpable violation of their duties and obligations as corporate directors, an absence of good faith or business judgment on their part, and an intentional or reckless disregard for their fiduciary duties to the Company and its public shareholders. The Director Defendants were aware of, or should have been aware of, the risk of serious damage to the Company caused by: (1) the repeated violation of FDA CGMP and QS regulations; (2) the repeated violations and non-compliance with the Consent Decree; and (3) the improper artificial inflation of the Company's financial condition and its stock price.

12.     The Director Defendants ratified and/or endorsed the ongoing violations of law complained of herein, and the conduct of Baxter's officers and employees that resulted in the Company's repeated violations of the FDA's CGMP and QS regulations, over an eleven year period. That ratification and/or endorsement involved a knowing and culpable violation of the Director Defendants' obligations as corporate directors, an absence of good faith on their part, and a reckless disregard for their fiduciary duties to the Company and its public shareholders. The Director Defendants were aware of, or, pursuant to reasonable inquiry, should have been aware of the ongoing violations of law in which Baxter was engaging and the risks of serious injury to Baxter as a result of those violations of law. The Director Defendants' conduct caused Baxter to waste its valuable assets when it was ordered to recall and destroy all of its Colleague Pumps currently used in the U.S., reimburse customers for the value of the recalled device and assist in finding a replacement for customers, and to disseminate publicly false and misleading information in violation of the federal securities laws.

13.     As alleged in greater detail below, the Director Defendants are implicated in and legally responsible for the wrongdoing complained of herein.  The Director Defendants are thus interested and lack independence with respect to the wrongs complained of, and the underlying conduct is not subject to business judgment protection.  Further, the Director Defendants, by virtue of pending litigation, would necessarily be forced to reject any demand by plaintiffs that any of the Director Defendants prosecute this derivative action to avoid incurring personal liability.  Thus, any such demand by plaintiffs would be futile.

## I.      JURISDICTION AND VENUE

14.     This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure ("F.R.C.P.").  This Court has jurisdiction under 28 U.S.C. §1332 (a) (1). Plaintiffs are citizens of Florida and Nevada, as set forth in paragraphs 16 and 17, no defendant is a citizen of those states.  The amount in controversy between the plaintiffs and the defendants exceeds $75,000, exclusive of interest and costs.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

15.     Venue is proper in this District.  Many of the acts and transactions giving rise to the violations of law complained of herein, including the improper conduct by Defendants in violating FDA quality standards and the preparation and dissemination to the investing public of false and misleading information, occurred in this District.

## II.     THE PARTIES

### A.      Plaintiffs

16.     Plaintiff North Miami Beach General Employees Retirement Fund, a resident of the State of Florida, is a current shareholder of the Company, was a shareholder at the time of the

misconduct complained of herein, and intends to continue to hold Baxter shares at least through the resolution of this action.

17.     Plaintiff Julie Weintraub, a resident of the State of Nevada, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and intends to continue to hold Baxter shares at least through the resolution of this action.

**B.     Defendants**

18.     Nominal defendant Baxter is a Delaware corporation headquartered in Deerfield, Illinois.   According to its public filings, Baxter describes itself as "a global, diversified healthcare company" which applies "a unique combination of expertise in medical devises, pharmaceutical and biotechnology to create products that advance patient care worldwide".   As used herein Baxter or the Company also includes Baxter Healthcare Corporation, a wholly-owned subsidiary of Baxter and its principal domestic operating subsidiary.   The Company employs more than 49,700 people in over 27 countries and sells its products in more than 100 countries.

**1.     The Board of Directors**

19.     Baxter's Board maintains six standing committees on which the directors serve. These standing committees include the Audit Committee, the Corporate Governance Committee, the Compensation Committee, the Finance Committee, the Public Policy Committee, and the Science and Technology Committee.   During 2009, the Audit Committee met eleven times; the Compensation Committee met five times; the Corporate Governance Committee met three times; the Finance Committee met six times; the Public Policy Committee met three times; and the Science & Technology Committee met two times.

20.     Defendant Robert L. Parkinson, Jr. ("Parkinson") has served as Chairman and Chief Executive Officer of the Company since April 2004 and during all relevant times is the Chairman and Chief Executive Officer of Baxter Healthcare Corporation. Parkinson, until 2001, had been President and Chief Operating Officer of Abbott Laboratories.  Virtually Parkinson's entire professional career has been involved in FDA-regulated pharmaceutical companies. Parkinson signed the Company's Form 10-K for the fiscal years ended December 31, 2003 through and including 2009.  Parkinson has received more than $70 million in compensation – including salary, stock awards, option awards, non-equity incentives, and other forms of compensation – for his service as a director of the Company.

21.     Defendant Blake E. Devitt ("Devitt") has served as a director of the Company since 2005. In addition, Devitt is currently the chairperson of the Audit Committee and serves as a member of the Corporate Governance Committee.  As a former partner of Ernst & Young LLP) Devitt was the Senior Audit Partner and Director, Pharmaceutical and Medical Device Industry Practice.  Thus, Devitt had expertise in the FDA-regulated pharmaceutical industry. Devitt signed the Company's Form 10-K for the fiscal years ended December 31, 2005 through and including 2009.  Since 2005, Devitt has received more than $1.0 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

22.     Defendant John D. Forsyth ("Forsyth") has served as a director of the Company since 2003. In addition, Forsyth is currently the chairperson of the Compensation Committee and a member of the Corporate Governance Committee.  Forsyth has been Chairman of Wellmark Blue Cross Blue Shield and Chief Executive Officer of University of Michigan Health System. Forsyth has unique expertise and experience in the healthcare industry.  Forsyth signed the

Company's Form 10-K for the fiscal years ended December 31, 2003 through and including 2009. Since 2003, Forsyth received more than $1.2 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

23. Defendant Gail D. Fosler ("Fosler") has served as a director of the Company since 2001. In addition, Fosler is currently serving on the Audit Committee and the Finance Committee. Fosler has served as a director of major NYSE-corporations and is fully knowledgeable of the fiduciary duties of a director of a public corporation. Fosler signed the Company's Form 10-K for the fiscal years ended December 31, 2001 through and including 2009. Since 2001, Fosler has received more than $1.3 million – including fees, stock awards, option awards, and other compensation – for her service as a director of the Company.

24. Defendant Carole J. Shapazian ("Shapazian") has served as a director of the Company since 2003. In addition, Shapazian is currently serving on the Compensation Committee and Public Policy Committee. Shapazian had served as a director of Ceridian Corporation for 11 years and is fully knowledgeable of the fiduciary duties of a corporate director. Shapazian signed the Company's Form 10-K for the fiscal years ended December 31, 2003 through and including 2009. Since 2003, Shapazian received more than $1.2 million – including fees, stock awards, option awards, and other compensation – for her service as a director of the Company.

25. Defendant Dr. Wayne T. Hockmeyer ("Hockmeyer") has served as a director of the Company since 2007. In addition, Hockmeyer is currently serving on the Public Policy and the Science and Technology Committee. Hockmeyer was the founder and Chairman of Medimmune, Inc., a healthcare company, until 2007 and has served as a director of several public companies. Hockmeyer has unique expertise and experience in the FDA-regulated

10

healthcare industry and is fully knowledgeable of the fiduciary duties of a corporate director. Hockmeyer signed the Company's Form 10-K for the fiscal years ended December 31, 2007 through and including 2009. Since 2007, Hockmeyer received more than $484,000 – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

26. Defendant Dr. Joseph B. Martin ("Martin") has served as a director of the Company since 2002. In addition, Martin is currently the chairperson of the Science and Technology Committee and is also serving on the Corporate Governance Committee and Public Policy Committee. Martin has been a medical professor at Harvard Medical School and Dean of several medical schools. Martin also has served as a director of several public companies. Martin has unique expertise and experience in the FDA-regulated healthcare industry and is fully knowledgeable of the fiduciary duties of a corporate director. Martin signed the Company's Form 10-K for the fiscal years ended December 31, 2001 through and including 2009. Since 2002, Martin received more than $1.3 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

27. Defendant Thomas T. Stallkamp ("Stallkamp") has served as a director of the Company since 2000. In addition, Stallkamp is currently serving on the Audit Committee and Compensation Committee. Stallkamp has served as director of several corporations and is fully knowledgeable of the fiduciary duties of a director of a public corporation. Stallkamp signed the Company's Form 10-K for the fiscal years ended December 31, 1999 through and including 2009. Since 2000, Stallkamp received more than $1.4 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

28.     Defendant Albert P.L. Stroucken ("Stroucken") has served as a director of the Company since 2004. In addition, Stroucken is currently serving on the Audit Committee and Finance Committee.  Stroucken has served as a director of major corporations and is fully knowledgeable of the fiduciary duties of a director of a public corporation.  Stroucken signed the Company's Form 10-K for the fiscal years ended December 31, 2004 through and including 2009. Since 2004, Stroucken has received more than $1.1 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

29.     Defendant Walter E. Boomer ("Boomer") has served as a director of the Company since 1997 and was appointed lead director in May 2008.  In addition, Boomer is currently serving on the Compensation Committee and Public Policy Committee.  Boomer has served as a director of major corporations and is fully knowledgeable of the fiduciary duties of a director of a public corporation.  Boomer signed the Company's Form 10-K for the fiscal years ended December 31, 1997 through and including 2009.  Since 1997, Boomer has received more than $1.3 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

30.     Defendant Dr. James R. Gavin III ("Gavin") has served as a director of the Company since 2003.  In addition, defendant Gavin is currently the chairperson of the Corporate Governance Committee and is a member of the Public Policy Committee and Science and Technology Committee.  Gavin, a medical doctor, has been a director of Amylin Pharmaceuticals, Inc. and a director of several corporations.  Gavin has unique expertise and experience in the FDA-regulated healthcare industry and is fully knowledgeable of the fiduciary duties of a corporate director.  Gavin signed the Company's Form 10-K for the fiscal years ended December 31, 2002 through and including 2009.  Since 2003, Gavin received more than $1.2

million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

31.     Defendant Peter S. Hellman ("Hellman") has served as a director of the Company since 2005. In addition, Hellman is currently a member of the Finance Committee. Hellman has served as a director of major corporations and is fully knowledgeable of the fiduciary duties of a director of a public corporation. Hellman signed the Company's Form 10-K for the fiscal years ended December 31, 2005 through and including 2009. Since 2008, Hellman received more than $1.0 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

32.     Defendant K.J. Storm ("Storm") has served as a director of the Company since 2003. In addition, Storm is currently is currently the chairperson of the Finance Committee and a member of the Audit Committee. Storm has served as a director of major corporations and is fully knowledgeable of the fiduciary duties of a director of a public corporation. Storm signed the Company's Form 10-K for the fiscal years ended December 31, 2003 through 2007 and 2009. Since 2003, Storm received more than $1.2 million – including fees, stock awards, option awards, and other compensation – for his service as a director of the Company.

33.     Defendants Parkinson, Devitt, Forsyth, Fosler, Shapazian, Hockmeyer, Martin, Parkinson, Stallkamp, Stroucken, Boomer, Gavin, Hellman and Storm comprise the current directors on the Board, and are collectively referred to as the "Director Defendants."

34.     Each non-employee director is paid a $65,000 annual cash retainer and a $1,500 fee for each Board and Committee meeting attended, other than for attending meetings of the Science and Technology Committee. The fee for attending a Science and Technology Committee meeting is $3,000 as this Committee holds less frequent but longer meetings, often off-cycle

from Board meetings. Each non-employee director who acts as the chair of any Committee meeting is paid an additional $1,500 for each meeting chaired. The lead director is paid an additional annual cash retainer of $30,000. Non-employee directors are eligible to participate in a deferred compensation plan that allows for the deferral of all or any portion of cash payments until Board service ends and provides participants with a select subset of investment elections available to all eligible employees under Baxter's tax-qualified section 401(k) plan.

35.     Each non-employee director is entitled to receive a grant of stock options annually on the date of the annual meeting of shareholders. Under Baxter's director compensation plan, the annual stock option grant value to each non-employee director is $65,000 on the grant date, based on a Black-Scholes valuation of Baxter's options as of that date. The stock options become exercisable on the date of the next annual meeting of shareholders, and may become exercisable earlier in the event of death, disability, or a change in control of Baxter.

36.     Each non-employee director also receives an annual grant of restricted stock units on the date of the annual meeting of shareholders. The number of restricted stock units equals the quotient of $65,000 divided by the closing sale price for a share of Baxter common stock on the date of the annual meeting. Directors have the option of deferring the distribution of the shares of stock underlying such restricted stock units until the earlier of three years from the grant date or termination from service as a director. The restricted stock units vest on the date of the next annual meeting of shareholders and may vest earlier in the event of death, disability, or a change in control of Baxter. Directors are credited with dividend equivalents on the shares underlying the restricted stock units and such dividends equivalents are reinvested in additional unvested restricted stock units. Directors have no other rights of a shareholder with respect to the shares underlying the restricted stock units prior to vesting.

37.     Baxter's Corporate Governance Guidelines require that after five years of Board service, each director is to hold common stock equal to five times the annual cash retainer provided to directors. As of December 31, 2009, all of Baxter's directors hold at least the required amount of common stock, except for defendant. Hockmeyer who was elected to the Board in September 2007 and is expected to satisfy the stock ownership requirement within the applicable five-year period.

### 3.     Company Officers

38.     Defendant Peter J. Arduini ("Arduini") has served as Corporate Vice President and President of Baxter's Medication Delivery Services of Baxter Healthcare Corporation since April 2005. Arduini was a named defendant in the Consent Decree. Defendant Arduini is referred to as the "Officer Defendant."

39.     The Director Defendants and the Officer Defendant are collectively referred to as "Defendants."

## III.    THE FIDUCIARY DUTIES OF BAXTER'S BOARD AND MANAGEMENT

40.     Under Delaware law, Baxter's directors and senior management have certain fiduciary duties to the Company and its shareholders, including the duties of loyalty and care. To discharge their legal duties, the Director Defendants were required to exercise reasonable and prudent supervision over the Company's management, policies, practices, controls, and financial affairs. Pursuant to their fiduciary obligations, the Director Defendants were required to use the same care and diligence as would an ordinary prudent person in a similar position. By virtue of this obligation, these Director Defendants were required to, during an eleven year period when Baxter was receiving numerous Warning Letters and other communications from the FDA,

subjected to on site inspections, entered into the Consent Decree, and was continuing to violate the FDA CGMP and QS regulations, but failed to, among other things:

(a)     To undertake a proper and adequate investigation once the FDA alerted the Company of the serous violations of CGMP and QS regulations;

(b)     To undertake a proper and adequate investigation and evaluation of the Company with respect to the FDA's concerns over violations of the CGMP and QS regulations concerning the Company's manufacturing facilities for and distribution of the Colleague and Syndeo Pumps, to determine if violations had occurred, and to take all steps necessary to correct them in accordance with the FDA's requests;

(c)     To act within the law and ensure that proper policies and procedures were in place and adhered to at Baxter's manufacturing facilities, to ensure its compliance with federal law and FDA regulations including CGMP and QS regulations applicable to the manufacture and distribution of the Colleague and Syndeo Pumps;

(d)     To set up protocols and procedures to properly monitor and make sure that the Company adheres to the terms and conditions set forth in the Consent Decree;

(e)     To undertake a proper and adequate investigation and evaluation of the Company's dissemination of information to the public to ensure that Baxter was not violating the federal securities laws;

(f)     To prevent the waste of Baxter's valuable assets and to manage, conduct, supervise and direct the business and affairs of Baxter carefully, prudently and

in good faith, in accordance with the laws, rules and regulations of the State of Illinois, the State of Delaware, and the Articles and by-laws of Baxter;

(g)     To exercise necessary control and supervision over the officers and employees of Baxter, especially those responsible for making sure that the Company complies with the FDA CGMP and QS regulations;

(h)     To establish guidelines and policies to govern adequately the structure and organization of the Company's operations, including the manufacturing, financial and disclosure practices;

(i)     Neither to violate, nor knowing or recklessly permit any officer, director or employee of Baxter to violate applicable federal rules and regulations, including FDA regulations and SEC requirements;

(j)     Upon receiving notice or information of an unsafe, imprudent, unsound or illegal practice, including repeated violations of the FDA's CGMP and QS regulations, to make a reasonable investigation in connection therewith, and to tale all necessary step to correct that condition or practice;

(k)     To establish and to maintain systematic and accurate books and records so the business affairs of Baxter and procedures for the reporting of the business affairs to the Board of Directors and periodically to investigate, or cause to investigate an independent investigation to be made of, Baxter's books and records;

(l)     To implement and maintain an adequate and functioning system of internal management information systems such that Baxter's assets would be safeguarded, its financial statement and information would be accurately

recorded and reported, and its corporate managers would be given prompt notice of serious problems or divergences so that risk to the Company would be minimized;

(m)     To supervise the preparation and filing of any audited financial statements, reports and other information required by law from Baxter, including the Company's SEC Forms 10-K, 10-Q, and 8-K, annual reports and proxy materials and submissions to the FDA, and to examine and evaluate any reports of examinations, audits and reports from FDA inspections, or other information required by federal or state law concerning the financial condition of Baxter and to make full and accurate disclosures of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

(n)     To ensure that Baxter did not engage in unsafe, imprudent or unsound practices and to become and remain informed as to how Baxter was, in fact, operating; and

(o)     To refrain from obtaining personal benefit at the expense of Baxter and its public shareholders.

41.     In addition, Baxter's foundational corporate documents (such as Board committee charters and Baxter's Corporate Governance Guidelines and Code of Conduct) also expressly detail the Board's duties, requiring, *inter alia*, that the Board must actively identify and root out unlawful and/or unethical business practices within the Company, must report and prevent such misconduct, and must disclose any deviation from strict performance of these obligations. In addition, according to the Company's March 2010 Proxy Statement, the Board is specifically charged with and responsible for enterprise risk management by reviewing business risks (*i.e.*,

strategic, operational, financial, and regulatory/compliance) across the Company after they have been identified and assessed by management. Specifically, regulatory updates are provided at least annually to the full Board although more frequently provided to the Public Policy Committee.

42.     Baxter and its shareholders rely on Board members to carry out their fiduciary duties. As stated on Baxter's website: "[t]he structures and processes we have in place to ensure integrity and oversight of business activities differentiate the company on many levels. We take a progressive, proactive approach to corporate governance" and "[o]ur approach is proactive, starting with our board of directors. But it is also deeply ingrained in our corporate culture, guiding how we work and how we do business." To implement this philosophy, the Company maintains, and directors are obligated to follow, formal Corporate Governance Guidelines, which are articulated by the Corporate Governance Committee of the Board. The Corporate Governance Guidelines, along with the committee charters and key practices of the Board committees, place ultimate decision-making authority for the Company with the Board.

43.     Baxter's Corporate Governance Guidelines recognize that the members of the Board must be kept fully informed in order to meet their fiduciary duties. They therefore require the establishment of an ongoing "Director Orientation and Continuing Education" program for new directors. Moreover, Baxter's "Board of Directors and each of its committees have the ability to hire outside consultants and experts as the Board of Directors or any committee deems necessary and appropriate" and have complete access to Baxter's management and employees of the Company.

44.     In addition to the express Corporate Governance Guidelines, Baxter also maintains a code of conduct in it "Procedures and Standards of Conduct for Employees" that

applies to all members of Baxter's Board of Directors and all employees of the Company including executive officers. The Board has several committees to monitor specific aspects of Baxter's business. These committees have their own, supplemental charters setting forth additional express duties for their respective members. For example, the charter of the Audit Committee provides that its members reviews the Company's financial reporting process and the integrity of its financial statements, Baxter's system of internal controls, the internal and external audit process and, specifically, the special obligation to monitor the Company's compliance with laws and regulations include those of the FDA. As such, the Audit Committee Charter should monitor the legal and regulatory developments that may materially affect Baxter which necessarily included the Company's Consent Decree and the compliance of the Consent Decree. Also, the Audit Committee was required to review the Consent Decree and assess how the type of conduct at issue could affect Baxter's contingent liabilities and risks going forward.

45.    Baxter's Public Policy Committee is expressly charged with ensuring that the members of the Board review and make recommendations regarding Baxter's Quality and Regulatory programs.

46.    Baxter's misconduct resulting in the entry of a Consent Decree and resulting in recall and destruction of its Colleague Pumps currently used in the U.S., the reimbursement of its customers for the value of the recalled pumps and being prohibited from manufacturing and selling new pumps is completely inconsistent with the fiduciary duties that all Baxter directors and senior management undertake as a condition to accepting their prestigious and well-paying positions with the Company.

## IV.    FACTUAL BACKGROUND AND THE UNLAWFUL CONDUCT

### A.    The Regulation of Baxter's Business

47. Baxter's business is the focus of extensive regulation and regulatory oversight by the Food and Drug Administration ("FDA"). The Federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §301 *et seq.*, whose purpose is to inform consumers about and protect consumers from dangerous food and drug products, regulates infusion pumps. Infusion pumps are electronic devices that control the delivery of medications and other solutions to patients, either intravenously or through other routes, for an extended period of time in a continuous or intermittent manner.

48. Under the FDCA, the FDA has the authority to force manufacturers of pharmaceutical products to bring products not proven to be safe and effective for their alleged usages into compliance with standards of purity and effectiveness provided for by the FDCA and the regulations promulgated thereunder. As the Pumps manufactured by Baxter deliver medications to consumers, they are deemed to be devices that impact public health and, as such, are covered by the FDCA.

**B.      The Events Leading Up to the Consent Decree**

49. During the period May 24 through June 16, 1999, inspectors for the FDA conducted an inspection at Baxter's Round Lake facility, where the infusion pumps are manufactured. That inspection revealed that these devices were 'adulterated,' within the meaning of the FDCA, in that "the methods used in, or the facilities or controls used in the manufacturing, packing, storage, or installation" were not in conformance with the QS regulations for medical devices as specified in Title 21 of the Code of Federal Regulations.

50. As a result of this inspection, the FDA on September 16, 1999 issued a Warning Letter to the Company that the inspections revealed that Company failed to, among other things: establish adequate corrective and preventive action procedures (CAPA) procedures; that

corrective and preventive actions were not verified or validated to ensure the action is effective and does not adversely effect the infusion pumps; and that preparation, specialist review, and management review of monthly non-conforming product trend analysis reports were not timely. The Warning Letter also noted that:

> The specific violations noted in this letter and in the FDA Form 483 issued at the conclusion of the inspection may be symptomatic of serious underlying problems in your establishment's manufacturing and quality assurance systems. You are responsible for investigating and determining the cause of the violations identified by the FDA. If the causes are determined to be systems problems, you must promptly initiate permanent corrective actions.

>       *              *            *

> You should take prompt action to prevent a repeat of these deviations. Failure to prevent these deviations may result in regulatory action being initiated by the Food and Drug Administration without further notice. These actions include, but are not limited to, seizure, injunction, and/or civil penalties.

51. During the period September 12 through November 15, 2000, the FDA conducted another round of inspections of the Round Lake facility. This inspection again revealed that Baxter's infusion pumps were "adulterated" within the meaning of the FDCA in that "the methods used in, or the facilities or controls used in the manufacturing, packing, storage, or installation" were not in conformance with the QS regulations for medical devices as specified in Title 21 of the Code of Federal Regulations.

52. On August 22, 2001, the FDA issued another Warning Letter to the Company that the September/November inspections revealed that the Company failed to, among other things: establish and maintain CAPA procedures that required Baxter to analyze sources of quality data such as monthly quality meetings; establish and maintain procedures to that ensure that information related to quality problems are disseminated to those directly responsible for assuring the quality of infusion pumps; establish and maintain verification and validation

procedures to ensure such corrective action is effective and does not adversely affect the finished

devise; and to conform, during the verification, that design output meet the design input

requirements before translation of the device design to production specifications.  The Warning

Letter also noted that:

> The specific violations noted in this letter and in the Form FDA-483 issued at the conclusion of the inspection may be symptomatic of serious underlying problems in your establishment's quality systems.  You [are] responsible for investigating and determining the causes of the violations identified by the FDA.  You also must promptly initiate permanent corrective and preventive action on your Quality system.

> \*             \*             \*

> We request that you take prompt action to correct these deviations.  Failure to correct these deviations may result in regulatory action being initiated by the Food and Drug Administration without further notice.  These actions include, but are not limited to, seizure, injunction, and/or civil penalties.

53.     The FDA conducted additional inspections of Baxter's medication delivery

systems facility in Round Lake in June 2005, which again revealed deficiencies with the CGMP

and QS requirements for the Colleague and Syndeo Pumps, as well as Baxter's failure to

implement adequate management controls over it quality operations and CAPA procedures.

During this inspection, the FDA also found that there were design defects relating to the

reliability of both the Colleague and Syndeo Pumps.

54.     It was during the course of the FDA's June 2005 inspection that Baxter initiated a

voluntary worldwide hold on all Colleague and Syndeo Pumps due to various design defects that

could cause the device to stop functioning.  Also during the June 2005 inspection, the Company

initiated a voluntary worldwide hold on all Colleague Pumps due to a product defect relating to a

temperature-sensitive component of the devices' timing circuit which causes the timing circuit to

fail.

### C. The FDA's Seizure of the Pumps and the Consent Decree

55.     As a result of the Company's consistent failure to comply with the Warning Letters, on October 12, 2005, the FDA filed a verified complaint for the forfeiture of the Baxter-owned Colleague and Syndeo pumps.  Named as defendants by the government were Baxter and defendants Parkinson and Arduini.  The complaint alleged that the Colleague and Syndeo Pumps were adulterated and misbranded within the meaning of the FDCA, 21 U.S.C. §§ 521 (c), 351 (h), and 352 (t)(2).  On the same day the government filed the complaint, the court issued a Warrant of Seizure and Monition for the approximately 6,000 Baxter-owned Colleague Pumps and approximately 850 Syndeo Pumps that were currently on hold at the two facilities which the FDA seized that day and on October 27th.

56.     On October 13, 2005, the Company issued a press release noting the action taken by the FDA and specifically pointing out that the seizure affected only Baxter-owned inventory and not customer-owned pumps being serviced by Baxter.  The press release further noted that "the company has developed an aggressive corrective action plan and remains in discussions with the FDA concerning these issues."  Defendant Parkinson stated that "[t]he quality of our products is our highest priority" and that "[w]e are committed to working with the agency and our customers to resolve these issues as quickly as possible."  At the time of this seizure, approximately 250,000 Colleague pumps were in use worldwide (200,000 of which in the U.S.) and approximately 5,000 Syndeo pumps in use worldwide.

57.     On October 26, 2005, the government filed an amended *in rem* complaint with substantially similar allegations as those contained in the complaint filed on October 12, 2005.  The amended complaint alleged that the Colleague and Syndeo pumps seized were adulterated within the meaning of the FDCA in that "their quality falls below that which they purport and are

represented to possess," that they were adulterated within the meaning of the FDCA in that the

methods used in and the facilities and controls used for, their manufacturing, packaging, storage,

and installation are not in conformity with CGMP and QS regulations, and were misbranded

within the meaning of FDCA in that Baxter failed or refused to furnish information as required

by the FDCA.

58.     On June 29, 2006, the FDA announced that the Company, defendants Parkinson

and Arduini entered into a Consent Decree of Condemnation and Permanent Injunction which

was approved by the court. As noted in the FDA press release:

> Under the decree, which permanently enjoins future violations, Baxter and the
> executives agreed to stop manufacturing and distributing within the United States
> all models of two types of pumps until Baxter corrects manufacturing deficiencies
> and brings the devices into compliance with FDA's requirements and regulations,
> announced Patrick J. Fitzgerald, United States Attorney for the Northern District
> of Illinois.

>           *               *               *

> Under the consent decree, Baxter agreed to take all necessary measures to ensure
> compliance with the CGMP and QS requirements by all of its facilities that
> manufacture, process, pack, label, hold or distribute the Colleague and Syndeo
> pumps in the United States. The decree also requires Baxter to retain an
> independent expert consultant to conduct inspections of its infusion pumps
> facilities and certify to FDA that corrections have been made. FDA will continue
> to monitor these activities through it inspections.

59.     The Consent Decree also required the Company to post a $20 million letter of

credit with the Court as a bond to assure its compliance. It further required Baxter to submit a

detailed corrective action plan to bring the pumps into compliance with federal law and, if

production is allowed to resume, Baxter must hire an independent auditor to conduct audit

inspections of the pumps' facilities' at least once a year for four years. Finally, if Baxter failed at

any time to comply with the Consent Decree, or violated the law or FDA regulations, the FDA

may order the Company to again stop manufacturing and distributing, recall the products, or take other action.

60.      The same day the Company, Parkinson and Arduini entered into the Consent Decree, Baxter issued a press release discussing the terms of the Consent Decree which was approved by the court.  The Company also disclosed that it expects to record a second quarter after-tax charge of up to $70 million for certain customer accommodations and to adjust reserves previously established for remediation costs.   Commenting on the Consent Decree, defendant Parkinson stated that:

> Patient well-being and safety are Baxter's top priority . . . . The agreement we've reached with FDA provides a clear path to resolving the COLLEAGUE and SYNDEO issues, so that we may continue to serve patients and medical professional by delivering the quality, reliability and innovation they expect from Baxter.

**D.      The Company's Failure to Comply With The Consent Decree**

61.      On December 14, 2006, the Company issued a press release announcing that it had received conditional approval for the Colleague Pump corrective action plan from the FDA and that it has submitted an updated 510(k) pre-market notification filing with the FDA. Defendant Parkinson, in discussing the FDA approval noted that:

62.      Reaching these milestones with the Colleague infusion pump reflects our commitment to resolving reliability and user interface issued associated with these critical devices and restoring our customers' confidence by delivering high quality, innovated infusion technologies.

63.      The Company continued to experience number issues concerning its fusion pumps.  On February 27, 2007, the Baxter Healthcare Corporation announced in a press release that it had received clearance from the FDA on its Colleague Pump 510(k) pre-market

notification. The press release noted that the Company "is preparing to modify pumps currently in the market and will soon submit manufacturing and service documentation to FDA in advance of deploying upgrades to U.S. COLLEAGUE infusion pumps." Defendant Arduini was quoted in the press release as saying that "[r]esolving issues with the COLLEAGUE infusion pump has been Baxter's top priority."

64. On June 21, 2007, the Company contacted their customers of the Colleague Pump informing them that the Company discovered during ongoing quality control processes, that repair, test and inspection data sheets, including electrical safety data, were falsified and, as a result, there could be defects in the device which could injure patients. Baxter requested that their customers take the pumps out of service and return them to the Company for a repeat inspection and servicing. The Company would provide loaner pumps free of charge.

65. On July 18, 2007, the Company issued a press release disclosing that the FDA classified Baxter's recent field corrective action regarding the manufactured or upgraded Colleague triple channel infusion pumps as a Class I recall. The press release noted that the Company identified a processing anomaly related to buffer overflow that occurs in specific situations, and that it had received reports of 16 serious injuries associated with this issue.

66. With respect to the recall of the Colleague Pumps on June 21, 2007, due to the falsification of documentation, the Company announced on July 25, 2007 that the recall was classified by the FDA as a Class I recall because of the potential risk of serious injury or patient death if the affected devices malfunctioned. On August 7, 2007, the Company expanded its recall of the Colleague Pump to other versions of that pump because of the falsification of electrical safety data.

67.     On January 23, 2009, the Company issued an Urgent Device Correction letter to its customers concerning the Colleague Single and Triple Channel Volumetric Pumps. The letter cited failures in the pumps that may cause them to stop the infusion while in the process of delivering medication and fluids to patients. According to the letter, failures of these pumps could lead to, among other things, fire hazards and serious injury and/or deaths. The letter provided instructions as to how to deal with specific situations. The Company issued the letter based on findings from its ongoing quality control processes. As a result of this action taken by the Company, on March 11, 2009, the FDA classified Baxter's Urgent Device Correction letter a Class I recall – which meant that there was risk of serious injury or patient death if the affected devices malfunctioned.

68.     On October 15, 2009, the Company reported if fiscal result for the third quarter of 2009 in which it noted that it was taking and after-tax special charges totaling $69 million primarily for the fixed write-offs related to the discontinuance of the Company's Solomix drug delivery system in development and the planned retirement costs associated with the Syndeo Pump.

69.     On or about February 22, 2010, the Company filed its Form 10-K for its fiscal year ending December 31, 2009. With respect to the issues surrounding the Colleague and Syndeo Pumps, the following was noted:

**Infusion Pump Charges**

The company remains in active dialogue with the FDA regarding various matters with respect to the company's COLLEAGUE infusion pumps, including the company's remediation plan and reviews of the company's facilities, processes and quality controls by the company's outside expert pursuant to the requirements of the company's Consent Decree. The outcome of these discussions with the FDA is uncertain and may impact the nature and timing of the company's actions and decisions with respect to the COLLEAGUE pump. The company's estimates of the costs related to these matters are based on the current remediation plan and

information currently available. It is possible that substantial additional charges, including significant asset impairments, related to COLLEAGUE may be required in future periods, based on new information, changes in estimates, and modifications to the current remediation plan.

While the company continues to work to resolve the issues associated with COLLEAGUE infusion pumps, there can be no assurance that additional costs or civil and criminal penalties will not be incurred, that additional regulatory actions with respect to the company will not occur, that the company will not face civil claims for damages from purchasers or users, that substantial additional charges or significant asset impairments may not be required, that sales of any other product may not be adversely affected, or that additional legislation or regulation will not be introduced that may adversely affect the company's operations and consolidated financial statements.

COLLEAGUE and SYNDEO Infusion Pumps
The company recorded charges and other costs of $27 million, $125 million, $14 million, $94 million and $77 million in 2009, 2008, 2007, 2006 and 2005, respectively, related to issues associated with its COLLEAGUE and SYNDEO infusion pumps.

The company stopped shipment of COLLEAGUE infusion pumps in July 2005 in the United States. Following a number of Class I recalls (recalls at the highest priority level for the FDA) relating to the performance of the pumps, as well as the seizure litigation described in Note 11, the company entered into a Consent Decree in June 2006. Additional Class I recalls related to remediation and repair and maintenance activities were addressed by the company in 2007 and 2009. The Consent Decree provides for reviews of the company's facilities, processes and controls by the company's outside expert, followed by the FDA. In December 2007, following the outside expert's review, the FDA conducted its inspection and remains in a dialogue with the company with respect to observations from its inspection as well as the validation of modifications to the pump required to remediate certain of the pumps.

Included in the 2005 charge was $4 million relating to asset impairments and $73 million for cash costs, representing an estimate of the cash expenditures for the materials, labor and freight costs expected to be incurred to remediate the design issues. Included in the 2006 charge was $3 million relating to asset impairments and $73 million for cash costs, which related to additional customer accommodations and adjustments to the previously established reserves for remediation costs based on further definition of the potential remediation requirements and the company's experience remediating pumps outside of the United States. Also, in 2006, the company recorded an additional $18 million of expense, of which $7 million related to asset impairments and $11 million related to additional warranty and other commitments made to customers. The $14 million of costs recorded in 2007 represented changes in estimates relating to

the previously established reserves for cash costs based on the company's experience executing the remediation plan.

As a result of delays in the remediation plan, principally due to additional software modifications, validation, evaluation and testing required to remediate the pumps, and other changes in the estimated costs to execute the remediation plan, the company recorded a charge associated with the COLLEAGUE infusion pump of $53 million in the first quarter of 2008. This charge consisted of $39 million for cash costs and $14 million principally relating to asset impairments. The reserve for cash costs principally related to customer accommodations, including extended warranties, and other costs associated with these delays.

In the third quarter of 2008, as a result of the company's decision to upgrade the global pump base to a standard software platform and other changes in the estimated costs to execute the remediation plan, the company recorded a charge of $72 million. This charge consisted of $46 million for cash costs and $26 million principally relating to asset impairments and inventory used in the remediation plan. The reserve for cash costs primarily consisted of costs associated with the deployment of the new software and additional repair and warranty costs.

In 2009, the company recorded a charge of $27 million related to planned retirement costs associated with SYNDEO and additional costs related to the COLLEAGUE infusion pump. This charge consisted of $14 million for cash costs and $13 million related to asset impairments. The reserve for cash costs primarily related to customer accommodations and additional warranty costs.

70.    The charges were recorded in cost of sales in the Company's consolidated statements of income, and were included in the Medication Delivery segment's pre-tax income.

### E.    The FDA Orders Baxter to Recall and Destroy the Colleague Pumps

71.    On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that it would not plan to begin the latest round of corrections to the adulterated and misbranded pumps until May 2012, and that it did not anticipate completion of the proposed corrections until 2013. The FDA found this proposal unacceptable.

72.    On April 23, 2010, the FDA announced in a press release a new initiative to address safety problems associated with external infusion pumps. As part of the initiative, the FDA was moving to establish additional premarket requirements for infusion pumps which

began with the issuance of a draft guidance letter to infusion pump manufactures. The press release noted that these pumps "have been the source of persistent safety problems. In the past five years, the FDA has received more than 56,000 reports of adverse events associated with the use of infusion pumps. Those events have included serious injuries and more than 500 deaths."

73. In response to the Company's April 8th proposed corrections schedule submission, on May 3, 2010, the FDA announced in a press release that it had sent a letter to Baxter on April 30, 2010, ordering the Company to recall and destroy all of its Colleague Pumps currently used in the U.S., reimburse its customers for the value of the recalled device, and assist in finding a replacement for customers. According to the FDA, this action was taken based on "a long standing failure to correct many serious problems with the pumps." The press release further stated that:

> On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that Baxter did not plan to begin the latest round of corrections to the adulterated and misbranded pumps until May 2012. The proposal also stated that Baxter does not anticipate completion of the proposed corrections until 2013. On that schedule, a device with known safety concerns would remain in use on patients needing specialized care until 2013. FDA found this proposal unacceptable. The 2006 consent decree gave FDA authority to take any action it deemed appropriate. The FDA has determined that this action is necessary, as Baxter has failed to adequately correct, within a reasonable timeframe, the deficiencies in the Colleague infusion pumps still in use.

74. On May 3, 2010, Baxter issued a press release announcing that it was recalling the Colleague pumps in the United States. The release provided in part:

> Baxter Healthcare Corporation today announced that it will recall COLLEAGUE infusion pumps from the U. S. market pursuant to an order under its existing June 2006 consent decree with the U.S. Food and Drug Administration (FDA). Baxter will work with the FDA to ensure that the recall process provides customers appropriate alternatives for supporting patients' needs.

As previously disclosed, Baxter entered into a consent decree with FDA under which the company has been pursuing remediation of the infusion pumps. The decree permits FDA to require the recall of the pumps, and FDA has communicated to the company that it will require such a recall, with the company providing monetary consideration or replacement pumps to customers on a timeline to be determined with FDA and based on medical need. Baxter intends to work with FDA to minimize disruption to healthcare facilities using COLLEAGUE pumps. Baxter anticipates that, among alternatives to be provided to customers, the company will offer to exchange Baxter's Sigma SPECTRUM infusion pumps for COLLEAGUE infusion pumps without charge to customers.

The consent decree permits Baxter to propose alternative actions to achieve the FDA's objectives under the decree, which the company intends to do. The final nature of the recall and offer to customers remain subject to that ongoing dialogue. Once final, Baxter will notify customers and make information available on www.baxter.com.

Notwithstanding that uncertainty, the company currently anticipates that it will record a pre-tax special charge of $400 to $600 million in the first quarter for the reasonably estimable cost of the recall. The company is not otherwise revising its earnings guidance for the year in connection with the recall.

75. Finally, on July 13, 2010, the FDA sent a Final Order to Baxter to Recall, or Replace the Colleague Infusion Pumps (the "July 13, 2010 Order") to defendants Parkinson and Arduini. The July 13, 2010 Order stated that:

Pursuant to Paragraph 15 of the Consent Decree for Condemnation and Permanent Injunction ("Consent Decree") entered on June 29, 2006, FDA is issuing this final order to Baxter Healthcare Corporation ("Baxter") to recall all Colleague Infusion pumps currently in use in the United States and to provide refunds or replacement pumps to customers at no costs. FDA has determined that this action is necessary, as Baxter has failed to adequately correct, within a reason timeframe, the deficiencies in the Colleague infusion pumps still in use. In addition, Baxter's latest proposed correction schedule, submitted to FDA on April 8, 2010, states that Baxter does not plan to begin the latest round of corrections to the pumps until May 2012. The proposal also states that Baxter does not anticipate completion of the proposed correction until 2013. This new timeline is unacceptable.

Therefore, under Paragraph 15 of the Consent Decree, FDA orders Baxter to take the following actions:

• Recall and destroy all Colleague infusion pumps covered by the Consent decree that are manufactured, distributes, or sold by Baxter or that are under the custody and control of Baxter's agents, distributors, or customers from the US market.

• Provide either a replacement infusion pump (other than the Colleague model) or refund to all owners, and a lease termination to all lessees, of Colleague infusion pumps no later than the date that is twenty four months after the date of this final order ("the transition period").

76.    The July 13, 2010 Order also provided the Company with a transition plan to accomplish the recall and to establish the programs to provide a refund or a replacement pump to customers.   The July 13, 2010 Order was followed by a "Questions and Answers about the Baxter Colleague Recall, Refund, and Replacement Action," which appeared on the FDA's website.

## V.    DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE

77.    Plaintiffs bring this action derivatively in the right and for the benefit of Baxter to redress the breaches of fiduciary duty and other violations of law by Defendants as alleged herein.

78.    Plaintiffs will adequately and fairly represent the interests of Baxter and its shareholders in enforcing and prosecuting its rights, and it has retained counsel experienced in prosecuting this type of action.

79.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

80.    At the time this action was initiated, the Board was comprised of thirteen (13) directors: Parkinson, Devitt, Forsyth, Fosler, Shapazian, Hockmeyer, Martin, Parkinson, Stallkamp, Stroucken, Boomer, Gavin, Hellman and Storm.  Plaintiffs did not issue a demand upon the Board prior to instituting this action against the Director Defendants for their breach of fiduciary duties, issuance of false and misleading statements to the securities market, and other

improper acts as alleged herein during the Relevant Period because such demand would be futile and useless act for the following reasons:

(a)     The entire Board of Directors of Baxter was on notice of, participated in and approved the wrongful acts complained of, including Baxter's failure to take necessary action with respect to the FDA's warnings of repeated violations of federal law, including FDA CGMP and QS regulations, with respect to the manufacture and distribution of the Company's Colleague and Syndeo Pumps;

(b)     The entire Board of Directors of Baxter, by its actions and inactions, is responsible for the Company's entry into the Consent Decree with the FDA, resulting in an enormous waste of corporate assets and loss revenues;

(c)     The entire Board of Directors of Baxter was on notice of, participated in and approved the wrongful acts concerning the Company's failure to comply with the Consent Decree, which resulted in the recall of the Colleague Pump;

(d)     The entire Board of Directors of Baxter, by its actions and inactions to ensure that the Company was in compliance with the Consent Decree, is responsible for the Company's waste of corporate assets and loss revenues when Baxter was ordered to recall an destroy all Colleague Pumps in the U.S., reimburse its customers and prevented from selling Colleague Pump until defects are corrected and approved by the FDA;

(e)     By virtue of their personal responsibility for the wrongs complained of, all members of the Board of Directors of Baxter are interested in and lack independence with respect to any potential demand upon them to take corrective action;

(f)     The actions complained of constitute violations of federal laws and regulations, and acts of corporate waste which are incapable of ratification, which represent flagrant violations of fiduciary duties, and involve conduct not subject to the protections of the business judgment rule;

(g)     By virtue of their participation in the above-described violations of the federal securities laws, Baxter and defendants Parkinson and Arduini have been named along with other officers of the Company as defendants in a pending securities class action, and any action by Baxter's Board against any of the malfeasors, including Parkinson, Baxter's Chairman of the Board and Chief Executive Officer, would subject Baxter to corporate liability and at the same time divest it of directors' and officers' liability insurance under the insures-versus-insured coverage exclusions; and

(h)     Although Baxter has been and will continue to be exposed to enormous expenses and losses in future revenue as a result of its violation of the Consent Decree – which resulted in the FDA's ordering Baxter to recall and destroy all Colleague Pumps in the U.S. and reimbursing customers – the Board has taken no action against itself or any other present or former employees of Baxter to attempt to recover for Baxter any portion of the damages and losses Baxter has already suffered or will suffer.

81.     Additionally, and significantly, Baxter's conduct of non-compliance with the FDA's CGMP and QS regulations with respect to the manufacture and distribution of the Company's Colleague and Syndeo Pumps, the consequent warnings by the FDA, the entry of the Consent Decree, and subsequent failure to comply with the Consent Decree, render the basis of

35

this derivative action distinct from the case of virtually every other corporate board in the United States. A typical corporate board might plausibly claim ignorance concerning compliance failures in general. In this case, Baxter's Board was made specifically and uniquely accountable and responsible under the Consent Decree for monitoring, ensuring, and enforcing the Company's compliance with FDA CGMP and QS regulations with respect to the manufacture and distribution of the Company's Colleague and Syndeo Pumps.

82.     As alleged herein and pursuant to the Company's Corporate Governance Guidelines, Procedures and Standards of Conduct for Employees, Delaware law, as well as the compliance required under the Consent Decree, each of the Board members was also awash in other "red flags" that necessarily informed them of the FDA Warning Letters and repeated violations of the FDA's CGMP and QS regulations with respect to the manufacture and distribution of the Company's Colleague and Syndeo Pumps, which resulted in the Company entering into the Consent Decree.

83.     Given these duties placed on the directors on the Board, to the extent any of these Director Defendants did not have actual knowledge of the extensive violations of FDA's CGMP and QS regulations, such lack of knowledge constitutes a bad faith breach of their duties.

84.     Defendants were, moreover, required to act upon this information to protect the Company from continued regulatory and legal violations being committed. Rather than doing so, the Director Defendants, in violation of their legal obligations, consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive regulatory and legal violations.  As a result, each of the Director Defendants face a substantial likelihood of liability for their conduct and demand is, therefore, excused.

85.     In addition to the foregoing, a majority of the Board's current members face a substantial likelihood of liability arising from their conduct on specific committees of the Board.

86.     Defendants Devitt, Fosler, Stallkamp, Storm and Stoucken are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. Defendants Devitt, Fosler, Stallkamp, Storm and Stoucken have each served as directors on the Board during most of the Relevant Period and have also served as members of the Audit Committee. As set forth herein, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations, and internal procedures.

87.     Further, Defendants Hockmeyer, Boomer, Gavin, Martin, and Shapazian are further conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Public Policy Committee. Defendants Hockmeyer, Boomer, Gavin, Martin, and Shapazian have each served as directors on the Board during most of the Relevant Period and have also served as members of the Public Policy Committee at various times.

88.     As noted previously, pursuant to the Public Policy Committee's charter, the members of the Public Policy Committee are specifically charged with reviewing and making recommendations regarding Baxter's Quality and Regulatory programs and performance and overseeing, reviewing, and making recommendations to the Corporate Responsibility Officer as set forth in the Company's Code of Conduct.

89.     Accordingly, demand on the Board is excused.

VI.     **DAMAGES SUSTAINED BY THE COMPANY**

90.    The Director Defendants' actions and inactions have caused and will continue to cause the Company to incur millions of dollars in damages and expenses, and loss revenue and have had, and will continue to have, devastating effects on the Company including;

    (a)    the costs for the recall and destruction of approximately 200,000 Colleague Pumps in from the U.S. market and the resultant costs for the reimbursement to customers;

    (b)    the recording of charges and other costs of $27 million, $125 million, $14 million, $94 million and $77 million in 2009, 2008, 2007, 2006 and 2005, respectively, related to issues associated with the Colleague and Syndeo infusion pumps and the booking of a pre-tax special charge of $588 million in the first quarter 2010 for the estimable cost of the recall;

    (c)    the costs associated to bring the Colleague Pump into compliance with FDA CGMP and QS regulations;

    (d)    the loss of future revenue;

    (e)    the lost of the Company's reputation in the business and investing community and among the public at large; and

    (f)    the subjection of the Company to substantial liability in securities fraud litigation on defendants' failure to make proper disclosures of, *inter alia*, the violations of the Consent Decree.

## COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE DIRECTOR DEFENDANTS

91.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

92.     The Director Defendants all owed and owe fiduciary duties to Baxter and its shareholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Baxter the highest obligation of good faith and loyalty in the administration of the affairs of Baxter, including the oversight of Baxter's compliance with federal laws governing the manufacturing and distribution of marketing of Colleague and Syndeo Pumps. Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the violations of the FDA's CGMP and QS regulations and consequent harm to the Company alleged herein.

93.     The Director Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, and failed to exercise due care to prevent the Company from repeatedly violating federal CGMP and QS regulations. The Director Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, that the Company was repeatedly violating the FDA's CGMP and QS regulations since at least 1999 and that they caused Baxter to violate the federal securities laws, while they were misusing proprietary corporate information for their personal profit. The Director Defendants became aware, or should have become aware through reasonable inquiry and diligence, of the adverse facts alleged herein, but did nothing to correct them and thereby breached their duty of care, loyalty, accountability and disclosure to the shareholders of the Company by failing to act as an ordinary prudent person would have acted in a like position.

94.     The Director Defendants have been responsible for the gross and reckless mismanagement of Baxter in connection with handling of the FDA's repeated complaints,

complying with the Consent Decree, and the management of the Company's disclosure practices in connection therewith. The Director Defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

(a)    They caused and/or allowed the Company to continually violate the FDA's CGMP and QS regulations since 1999, failed to correct each violation and failed to implement adequate safeguards, investigation, consideration, or due diligence to prevent further violations and actions, including the recall and destruction of the infusion pumps, taken against the Company by the federal government;

(b)    They concealed from the Company's shareholders and the investing public the true nature and extent of the problems that the Company was suffering thus causing the Company to violate the federal securities laws;

(c)    They subjected Baxter to adverse publicity, which greatly increased its costs to raise capital and impaired its earnings; and

(d)    They misused or permitted the misuse of Baxter's internal proprietary corporate information in violation of federal and state laws and corporate rules and policies, to the personal profit of certain corporate insider fiduciaries.

95.    As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary obligations, Baxter has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage included, among other things, the substantial penalties, fines, liabilities and expenses described herein.

96.    As a result of the Director Defendants' wrongful conduct and wrongful actions, including allowing the Company to violate the FDA's CGMP and QS regulations and the failure

to properly and adequately maintain a system of internal controls adequate to ensure the Company's compliance with FDA's CGMP and QS regulations and federal securities laws, Baxter has suffered and will continue to suffer considerable damage.

97.     Additionally, the Director Defendants authorized, caused or permitted Baxter to operate and report information in a manner which was contrary to federal and state regulations, thus exposing it to liability for violation of federal securities laws for which the Company has been sued in several class actions in federal court. The Director Defendants' conduct, as alleged herein, has also caused damage to the Company's goodwill and reputation due to the negative adverse publicity that their actions have generated, and they have impaired Baxter's ability to raise capital at a reasonable and/or low cost because the Company's credit rating has been adversely affected, and its cost of capital has, therefore, increased, harming the Company.

98.     All of the Director Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of their fiduciary duties to the Company and conspired to, and did, abuse the control vested in them by virtue of their high-level positions in the Company.

99.     Baxter and its shareholders have been injured by reason of the Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company

100.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT II

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS FOR WASTE OF CORPORATE ASSETS

101.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

102.     By virtue of their *ultra vires* actions in violation of law, the Director Defendants caused Baxter to incur and will incur hundreds of million in charges and expense as a result of Baxter's failure to comply with Warning Letters and the Consent Decree which resulted in the recall and destruction of the fusion pumps and reimbursement of returned pumps from customers.  Thereby, the Director Defendants wasted Baxter's assets.

103.     As a direct and proximate result of the Director Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

104.     Baxter and its shareholders have been damaged by reason of the Director Defendants' waste of corporate assets.

105.     As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**COUNT III**

**DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY**
**AGAINST DEFENDANT ARDUINI**

106.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth here.

107.     As an officer of the Company, Arduini is a fiduciary of the Company and of all its shareholders and owes to them the duty to conduct the business of the Company loyally, carefully, diligently, prudently, and in good faith.  This cause of action is asserted based upon Arduini's acts in violation of applicable state and common law, which constitute breaches of his fiduciary duties.

108.     Defendant Arduini breached his fiduciary duties, including the duties of good faith and of care to the Company and of all its shareholders, by not only failing to act as an

ordinarily prudent person would have acted in a like position, but also by acting intentionally and/or with gross recklessness and in conscious disregard of his responsibilities to act in the best interests of the Company and of all of its shareholders.

109. As a direct and proximate result of the wrongful conduct and actions by Arduini, Baxter has suffered and will continue to suffer considerable damage.

110. Arduini engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of his fiduciary duties to the Company.

111. Baxter and its shareholders have been injured by reason of Arduini intentional and/or reckless disregard of his fiduciary duties.

112. As a result of the misconduct alleged herein, defendant Arduini is liable to the Company.

## COUNT IV

## DERIVATIVE CLAIM FOR GROSS MISMANAGEMENT
## AGAINST ALL DEFENDANTS

113. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

114. Defendants had a duty to Baxter and its shareholders to prudently supervise, manage and control the operations and business of Baxter.

115. Defendants, by their actions and by engaging in the wrongdoing conduct described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Baxter in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Baxter's affairs and in the use and preservation of Baxter's assets.

116.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Baxter to engage in the improper conduct complained of herein which they knew had an unreasonable risk of damage to Baxter thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Baxter.

117.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

**COUNT V**

**DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO OVERSEE THE COMPANY AND MAINTAIN INTERNAL CONTROLS AGAINST ALL DEFENDANTS**

118.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

119.   As alleged herein, each of the Defendants (and particularly the Director Defendants) had a fiduciary duty to, among other things, to prudently supervise, manage and oversee the operations, business and internal controls of Baxter.  Moreover, each of the Defendants had a duty, when put on notice of problems with the Company's business practices and operations, to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

120.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Baxter in a manner consistent with the duties imposed upon them by Delaware law and Illinois law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Baxter's affairs.

121.    Defendants willfully ignored the obvious and pervasive problems with Baxter's internal control practices and procedures (or complete lack thereof), specifically relating to the Company's compliance with the Consent Decree and failed to make a good faith effort to correct the problems or prevent their recurrence.

122.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

123.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment as follows:

(a)    Determining that this action is a proper derivative action maintainable under law and demand is excused;

(b)    Awarding, against all Defendants and in favor of Baxter, the damages sustained by the Company as a result of Defendants' breaches of fiduciary and contractual duties;

(c)    Awarding to Baxter restitution from Defendants, and from each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

(d)    Directing Baxter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

(e)    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(f)     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated:  October 12, 2010

**LASKY & RIFKIND, LTD.**

/s/ Leigh R. Lasky
Leigh R. Lasky
Norman Rifkind
Amelia S. Newton
Heidi VonderHeide
350 N. LaSalle Street, Suite 1320
Chicago, IL  60654
Tel:  312.634.0057

**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
Robert M. Roseman
Mark S. Willis
Andrew D. Abramowitz
Daniel J. Mirachi
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.:  215.496.0300

*Counsel for Plaintiff North Miami Beach
General Employees Retirement Fund*

**LAW OFFICES BERNARD M.
GROSS, P.C.**
Deborah. R. Gross
Robert P. Frutkin
100 Penn Square East, Suite 450
Philadelphia, PA 19107
Tel.:  215.561.3600

**LAW OFFICES OF JAMES ORMAN**
James Orman
1845 Walnut Street, 15th Floor
Philadelphia, PA  19103
Tel:  215.523.7800

*Counsel for plaintiff Julie Weintraub*

**VERIFICATION OF**
**NORTH MIAMI BEACH GENERAL EMPLOYEES**
**RETIREMENT FUND**

STATE OF FLORIDA         )
                                  ) s.s.:

COUNTY OF MIAMI-DADE    )

I, LORI HELTON, hereby verifies that:

1.       I am the Chairperson, for Plaintiff, North Miami Beach General Employees Retirement Fund in the above-entitled action

2.       I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of North Miami Beach General Employees Retirement Fund and I authorize its filing.

3.       I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

4.       I further declare that North Miami Beach General Employment Retirement Fund is a current holder, and have been a holder, of the common stock of Baxter International Inc. during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

*Lori Helton*

Lori Helton
on behalf of North Miami Beach General
Employees Retirement Fund

1

# VERIFICATION OF

STATE OF NEVADA            )
                           ) s.s.:
COUNTY                     )

I, J ulie Weintraub, hereby verifies that:

1.      I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Baxter International, Inc., nominal defendant and I authorize its filing.

2.      I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

3.      I further declare that I am a current holder, and have been a holder, of the common stock of Baxter International Inc. during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

1