**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, Derivatively on Behalf of BAXTER INTERNATIONAL INC., | ) ) ) ) | Case No. 10 C 6514 |
| | ) | |
| Plaintiff, | ) | Hon. John J. Tharp, Jr. |
| vs. | ) ) | |
| ROBERT L. PARKINSON, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| - and - | ) ) | |
| BAXTER INTERNATIONAL INC. | ) ) | |
| Nominal Defendant | ) ) ) | |
| _____ | ) | |

**DECLARATION OF JUDITH S. SCOLNICK IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR: (1) FINAL APPROVAL OF DERIVATIVE SETTLEMENT; AND
(2) AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND
PAYMENT OF AN INCENTIVE AWARD TO LEAD PLAINTIFF**

I, JUDITH S. SCOLNICK, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of New York, and I have been admitted in this case *pro hac vice*.  I am a member of the law firm of Scott+Scott, Attorneys at Law, LLP ("Scott+Scott" or "Lead Counsel"), counsel for Lead Plaintiff Westmoreland County Employee Retirement System ("Lead Plaintiff" or "Westmoreland") in this shareholder derivative action brought on behalf of Nominal Defendant, Baxter International Inc. ("Baxter" or the "Company").  I have been actively involved in prosecuting and resolving this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon actively supervising and participating in all material aspects of the above-captioned action (the "Action").

2.      I submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, for: (a) final approval of the Stipulation,[1] which provides for corporate governance therapeutics valued by Plaintiff's highly regarded corporate governance expert at $50 million-$60 million; and (b) Lead Counsel's application for attorneys' fees and expenses, and Incentive Award for Lead Plaintiff.

I.      **PRELIMINARY STATEMENT**

3.      After more than four years of litigation, extensive motion practice, document discovery, an appeal, a vigorously negotiated settlement, and approval of the Settlement after thorough vetting by the Special Litigation Committee ("SLC"), Lead Plaintiff and Lead Counsel have achieved a substantial and valuable Settlement of this Action, which this Court preliminarily approved in its Order Preliminarily Approving Settlement and Providing for Notice

---

[1]      Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Stipulation and Agreement of Settlement (as Revised) dated October 14, 2014 ("Stipulation").  ECF No. 208-02.

("Preliminary Approval Order").  ECF No. 216.  For the reasons set forth below, Lead Counsel believes that final approval of the Settlement is warranted and that the application for an award of attorneys' fees and expenses and an Incentive Award for Lead Plaintiff should be granted.

4.      This case has been zealously litigated from the outset.  The Settlement was achieved only after Lead Counsel, *inter alia*: (a) conducted a detailed investigation of potential claims against the Individual Defendant directors and executives on behalf of Baxter, including the review of United States Food and Drug Administration ("FDA") public communications and press releases, and 220 documents,[2] comprised of confidential agendas, minutes and presentations to the Baxter Board of Directors and its committees regarding the Colleague Infusion Pump, the June 2006 Consent Decree with the FDA and the corrective action plans Baxter submitted to the FDA from June 2006 to May 2010; (b) moved, briefed and prevailed before the Honorable Edmond Chang on behalf of Westmoreland, for appointment of Lead Plaintiff and Lead Counsel, over three competing plaintiffs; (c) prepared a detailed consolidated amended complaint; (d) fully briefed comprehensive motions to dismiss filed by the Individual Defendants and Nominal Defendant Baxter, that were granted on September 19, 2012; (e) briefed, argued, and prevailed before the Seventh Circuit Court of Appeals in reversing this Court's dismissal of the Action and remanding for further proceedings; (f) upon remand obtained from this Court, and over Defendants' objection, an order on November 13, 2013 requiring Defendants to produce approximately 68,418 documents consisting of 474,073 pages that were produced in the related securities class action, *City of Lakeland Employees Pension Plan v. Baxter International Inc.*, No. 10-cv-6016 (N.D. Ill.) ("Lakeland" or "Securities Case")

---

[2]      8 *Del. C.* §220 permits shareholders to inspect a Delaware corporation's books and records "for any proper purpose."  Delaware courts have repeatedly held that a shareholder's intent to investigate reported misconduct constitutes a proper purpose.

pertaining to Baxter's efforts to remedy the Colleague Pump from November 2008 forward; (g) reviewed all the discovery documents; (h) prepared and briefed competing Case Management orders; (i) prepared the initial disclosures required by Fed. R. Civ. P. 26; (j) briefed the disputed issue of the scope of the Seventh Circuit's mandate; (k) opposed the motion to stay the Action filed by the Special Litigation Committee; (l) engaged in several months of negotiation with Defendants' external and internal counsel (while being consistently advised by Plaintiff's corporate governance expert Professor Sean Griffith) that resulted in a very favorable settlement of this Action premised on valuable, funded corporate governance reforms; and (m) met with the single SLC Board member, Dr. Uma Chowdhry, and her attorneys, Chancellor William B. Chandler III (Ret.) and other lawyers from Wilson, Sonsini Goodrich & Rosati on May 28, 2014 to present, and eventually obtain, approval of the Settlement Agreement. The efforts that were required to complete these tasks were extensive and represented an immense risk, given the contingency-based nature of Lead Counsel's representation.

5. In view of the foregoing, there is no question that the Settlement is the result of negotiations by counsel who possessed a full understanding of both the strengths and weaknesses of their respective cases and takes into consideration the significant risks specific to this Action. When balanced against the significant risks Lead Plaintiff faced in bringing the Action to trial and defending a favorable verdict against likely appeal, this Settlement, which is valued by Plaintiff's expert at between $50 million and $60 million, and which provides cutting-edge corporate governance, designed to prevent Baxter from experiencing future corporate trauma similar to the May 2010 FDA $588 million Recall/ Replace or Refund Order that was at issue in the Action, represents an excellent result for this shareholder derivative case. Investigation, §220 document production, document discovery, motion practice, and legal research informed Lead

Counsel that, while they believed the case was meritorious, there were also weaknesses that had to be carefully evaluated in determining what course of action was in the best interests of the Company (*i.e.*, whether to settle and on what terms, or to continue to litigate through, potentially, trial and appeal). As set forth in further detail below, despite the fact that Lead Plaintiff's allegations and claims were supported by legal authority as well as evidence discovered during extensive pre-trial investigation and discovery, victory was not guaranteed. There were still, as discussed below, uncertainties with respect to Lead Plaintiff's ability to prevail through summary judgment, and trial, and, even in the event of success at trial, to defend a successful verdict against appeal.

6. Further evidence that the Settlement represents an excellent result for the Company is the fact that the SLC and its counsel, Wilson, Sonsini Goodrich & Rosati, led by Chancellor William Chandler III (Ret.), who is certainly extremely knowledgeable of Delaware substantive law that applies to this Action, have approved the Settlement. Additionally, as of the filing of this Declaration, no shareholders have contacted Lead Counsel to object to the Settlement.

7. Finally, the requested attorneys' fees and expenses of $3.9 million are reasonable and appropriate. This Fee and Expense Award request is well within the range of fees frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits that Lead Counsel conferred on the Company, the risks they undertook, the quality of their representation, the nature and extent of their legal services, and the fact that Lead Counsel vigorously pursued the case, even though a settlement was far from guaranteed at its outset. Plaintiff's Lead Counsel, Scott+Scott, Attorneys at Law, LLP, and liaison counsel, Freed Kanner London & Millen LLC, have expended considerable time and

effort prosecuting the Action on a fully contingent basis and have advanced litigation and expert expenses with no guarantee of payment. Additionally, as supported by the Declaration of Jeffrey Balzer, Lead Plaintiff Westmoreland's Controller and Secretary, a $15,000 Incentive Award (which will be paid from, not in addition to, the Fee and Expense Award), is also reasonable and appropriate in my opinion. Westmoreland has actively prosecuted this case through more than four (4) years of litigation including §220 document requests, two complaints, opposing formidable motions to dismiss, an appeal to the Seventh Circuit, and thorough settlement negotiations. *See* Balzer Decl., ¶¶4, 5 and 8. As with the Settlement, to date no shareholder has objected to Lead Counsel's request for its Fee and Expense Award or the Incentive Award payment to Lead Plaintiff Westmoreland.

8. Because this Declaration is submitted in support of a settlement, it is inadmissible in any subsequent proceedings, other than in connection with the Settlement. In the event the Settlement is not approved by the Court, this Declaration and the statements contained herein are without prejudice to Lead Plaintiff's position on the merits of this Action.

9. The following is a summary of the nature of the claims, the principal events that occurred during the course of the litigation, and the legal services that Lead Counsel provided.

## II. FACTUAL BACKGROUND

### A. Summary of Lead Plaintiff's Claims

10. Beginning in 1999, the FDA put Baxter, a Delaware company, on notice of defects in the Company's 200,000 Colleague Infusion Pumps ("Colleague Pumps") that posed a risk of serious injury, and even death, to patients. The Colleague Pump is a medical device that delivers intravenous medications to patients and is commonly used in home and non-hospital settings. For seven years, in violation of federal law, Baxter failed to remediate the problem,

resulting in a June 2006 Consent Decree with the FDA that: (i) ordered Baxter to stop selling pumps, (ii) required Baxter to either implement a Corrective Action Plan to aggressively remediate the Colleague Pumps, or to destroy them, and (iii) placed responsibility for the Company's compliance with the Consent Order squarely on Baxter's Board of Directors.

11.     This shareholder derivative Action arose from Baxter's conduct from June 2006 until May 2010 with regard to its efforts to remedy the Colleague Pump to comply with the 2006 Consent Order with the FDA.  Essentially, Baxter was required by the FDA to fix the numerous malfunctions of the Colleague Pumps, bring its manufacturing facilities into compliance with 21 C.F.R. Part 820, the Quality System Regulation, and conduct clinical trials to demonstrate proper remediation.

12.     Although initially Baxter made good-faith efforts to comply with the FDA requirements, Lead Plaintiff alleges that, as time went on and the remediation efforts became increasingly costly, the Baxter Board determined to "throw in the towel" and stopped devoting the resources necessary to comply with the FDA's requirement that a new clinical trial be held to assure that the remediation of the Colleague Pump was safe and effective.  During this time, the FDA repeatedly warned Defendants in writing and in person that their remediation efforts were insufficient and that their timeline for remediation was unacceptably long.

13.     In April 2010, almost four years after the Consent Decree, Baxter submitted a proposed correction schedule whereby Baxter "did not plan to begin the latest round of corrections to the adulterated and misbranded pumps until May 2012" and did not anticipate completion until 2013.  In response, the FDA determined that it would be "unacceptable" to expose "patients needing specialized care" to a "device with known safety concerns" and ordered an immediate recall.

14.     The order issued on May 3, 2010 ("May 2010 Order") was the first one in FDA history to require a company to reimburse customers for a recalled product. It required Baxter, at its own expense, to recall, replace, or refund the cost of the Colleague Pumps to the approximately 200,000 users. Implementation of the May 2010 Order cost Baxter approximately $588 million, as well as reputational damage. In addition, a securities class action was filed in the Northern District of Illinois alleging that certain Baxter management, including its CEO, Parkinson, misrepresented and failed to disclose material information to investors about the progress of Baxter's remediation efforts. That case has survived a motion to dismiss under the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"), and is now in discovery. *See generally City of Lakeland Employees Pension Plan v. Baxter Int'l Inc.*, No. 10-6016, 2012 WL 607578 (N.D. Ill. Jan. 23, 2012).

## III.     PROCEDURAL HISTORY

### A.     Investigation and the §220 Books and Records Process

15.     Prior to filing a complaint in this Action, Lead Counsel reviewed all available public material concerning the FDA's May 2010 Order, including Baxter's SEC filings and press releases, all related public materials available on the FDA website, including the 2006 Consent Order, Form 483 letters (FDA letters advising the recipient pharmaceutical or medical device company of "inspectional observations" of a facility or product that requires correction), FDA warning letters, and the publicly filed papers in the *Lakeland* securities class action. In addition, Lead Plaintiff made a Freedom of Information Act ("FOIA") request of the FDA, seeking disclosure of all information regarding the Colleague Pump.

16.     On October 18, 2010, Lead Plaintiff made a Demand pursuant to 8 *Del. C.* §220 for books and records pertaining to Baxter's efforts to remedy the Colleague Pump. More specifically, Lead Plaintiff requested all Baxter Board of Directors and committee minutes,

agendas and Board or committee presentations where the Colleague Pump remedial efforts and Baxter's compliance with the 2006 Consent Order were discussed. Making a books and records request to enable a shareholder derivative plaintiff to "plead with particularity" demand futility is the long-recommended practice of Delaware jurisprudence. *See King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1150 (Del. 2011).

17.    Lead Counsel negotiated a confidentiality agreement with Potter Anderson & Corroon LLP, a reputable Delaware firm that represented Baxter during the §220 books and records process. After several telephonic meet and confers, on December 22, 2010, Lead Counsel received most of the requested documents consisting of extracts of Board minutes and Board packages discussing the Colleague Pump.

18.    After scrutinizing those documents and other materials described above, Lead Counsel and Lead Plaintiff determined that demand to the Baxter Board would be futile and prepared a shareholder derivative complaint for filing. Lead Counsel retained the services of a highly regarded complex litigation firm in Chicago, Freed Kanner London & Millen LLC, to serve as liaison counsel.

19.    On January 10, 2011, Westmoreland filed its verified shareholder derivative complaint with this Court (Civil Action No. 11-cv-151) under seal. The case was assigned to the Honorable Edmond Chang.

20.    By the time Lead Plaintiff's complaint was filed, there were already three separate shareholder actions on file in this Court derivatively on behalf of Baxter against members of Baxter's Board of Directors, former directors, and certain current and former officers of the Company: *North Miami Beach General Employees Retirement Fund v. Parkinson*, No. 10-cv-

6514; *Salyers v. Boomer*, No. 10-cv-7131; and *Louisiana Municipal Police Employees' Retirement System v. Parkinson*, No. 10-cv-7317.

21.     Lead Plaintiff moved for consolidation of its Action with the other three shareholder derivative actions, for reassignment of all cases to the same judge, for appointment of Westmoreland as Lead Plaintiff, Scott+Scott as Lead Counsel, Freed Kanner London & Millen LLC as Liaison Counsel, and opposed motions by the other plaintiffs to be Lead Plaintiff. Westmoreland was the only Plaintiff that undertook a §220 books and records demand prior to filing suit and utilized information obtained from examining the documents in its complaint.

22.     All four cases were reassigned to the Honorable Edmond E. Chang on January 7, 2011 (ECF No. 43) and after extensive briefing, Judge Chang, on July 5, 2011 consolidated all four cases and appointed Westmoreland as Lead Plaintiff and its chosen counsel, Scott+Scott, Attorneys at Law, LLP as Lead Counsel and Freed Kanner London & Millen LLC as Liaison Counsel.  ECF No. 79.

23.     On September 26, 2011, Westmoreland filed an Amended Consolidated Complaint ("Amended Complaint") against the Individual Defendants for alleged breaches of fiduciary duty in connection with a variety of events, including, among others (i) the FDA's May 3, 2010 Recall and Refund/Replace Order for Baxter's Colleague Infusion Pumps; (ii) the discovery of a contaminant in the active pharmaceutical ingredient of heparin, an anticoagulant sold by Baxter, (iii) alleged misrepresentations relating to Baxter's plasma-protein therapies business and Baxter's remediation of the Colleague Pump; (iv) a warning letter from the FDA to Baxter relating to Baxter's marketing of its Aralast NP dialysis product; (v) the discovery of contaminated lots of peritoneal dialysis solutions manufactured by Baxter in Castlebar, Ireland, and (vi) alleged sales of Company stock by certain officers and directors.  Lead Plaintiff did not

pursue any of the instances of alleged misconduct other than the issue with the Colleague Pump's failed remediation and the misrepresentations arising therefrom.

### B. Briefing on Defendants' Motion to Dismiss

24.     On October 17, 2011, the Individual Defendants moved to dismiss the Amended Complaint for failure to make a demand on the Baxter Board of Directors pursuant to Fed. R. Civ. P. 23.1 and failure to state a viable claim pursuant to Fed. R. Civ. P. 12(b)(6).  On the same date, Nominal Defendant Baxter moved to dismiss, or alternatively, stay the Action until after the *Lakeland* case and litigation pertaining to other misconduct raised (and later abandoned) by Lead Plaintiff in the Complaint.  On November 28, 2011, Lead Plaintiff filed its opposition to both Individual Defendants' motion, and to Baxter's motion.  Defendants filed their reply briefs on January 9, 2012.  After the matter was submitted to the Honorable Judge Chang, the Parties continued to vigorously advocate their positions and submitted five notices of new authority and responses thereto.

25.     On April 2, 2012, the Action was transferred to the Honorable Ruben Castillo and the Parties submitted a Joint Status Report to the Court on April 27, 2012.  The Action was again reassigned on June 1, 2012 to the Honorable John J. Tharp, Jr., and the Parties submitted an updated status report on June 18, 2012 pursuant to order of this Court.  On July 11, 2012, the Parties attended a status conference where the Court advised that it would take the motions to dismiss the Amended Complaint under advisement.

26.     On September 19, 2012, the Honorable John J. Tharp, Jr. granted the Defendants' motion to dismiss without leave to amend on the ground that Westmoreland had failed to adequately plead futility of demand on the Board with respect to all of the alleged breaches of duty set forth in the Amended Complaint.

### C.   The Seventh Circuit Appeal

27.    On October 11, 2012, Westmoreland noticed its appeal to the United States Court of Appeals for the Seventh Circuit. Westmoreland limited its appeal to the alleged breaches of fiduciary duty relating to Baxter's remediation of the Colleague Pump and public representations regarding the status of the remediation.

28.    The appellate record was assembled and filed on November 7, 2012. Lead Plaintiff, Appellant, filed its opening brief on February 22, 2013, and its reply brief April 9, 2013. Oral argument was held on April 22, 2013. Following oral argument, Lead Plaintiff responded to two Federal Rule of Appellate Procedure 28(j) notices of new authority filed by Appellee; Lead Plaintiff distinguished both cases.

29.    On August 16, 2013, the Court of Appeals reversed and remanded the case, as limited by Westmoreland, to the District Court. *Westmoreland Cty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719 (7th Cir. 2013). The mandate issued on September 27, 2013. ECF No. 140.

### D.   Document Discovery, Competing Case Management Schedules, Scope of Mandate Briefing

30.    Baxter and the Individual Defendants answered the Amended Complaint on December 11, 2013 (ECF Nos. 162, 163), and, after several meet and confers, the Parties submitted competing case management orders. In December 2013, the Parties also exchanged Rule 26(a)(1) Initial Disclosures.

31.    On December 13, 2013, Individual Defendants moved for summary judgment and accompanied the motion with a 371-page appendix to the Rule 56.1(a)(3) Statement. At a status conference before Judge Tharp on December 19, 2013, the Court ordered, over Defendants' objection, the production of all the documents that Baxter had produced in the *Lakeland* securities action involving remediation of the Colleague Pump. The 68,418 documents,

consisting of 474,073 pages dated from November 2008 forward and included, among other things, in-depth descriptions of the various teams at Baxter involved with the remediation, as well as communications between Baxter executives and FDA officials. This Court advised the Parties that should the Individual Defendants elect to not withdraw the premature summary judgment motion, it would be considered after discovery was completed.

32.     In early January 2014, the Parties briefed their differing views of whether the Seventh Circuit mandate included claims arising from Defendants' misrepresentations regarding Baxter's efforts to fix the Colleague Pump. The Court concluded at a January 23, 2014 status conference that "Plaintiffs' claim premised on alleged misrepresentations was not part of the case on remand." ECF No. 173. At that same hearing, the Defendants announced that Baxter had appointed a Special Litigation Committee ("SLC") to investigate whether it was in the best interests of the Company to pursue or resolve Westmoreland's claims and expected the SLC to request a stay of the Action in short order.

### E.     Settlement Negotiations

33.     In January 2014, the Parties opened discussions about possible settlement of the Action, although the litigation was proceeding on a separate track. Between January 2014 and April 2014, the Parties engaged in extensive arm's-length negotiations, involving frequent telephone conversations, and exchanged many drafts of corporate governance therapeutics. The goal of the corporate governance reform was to design a mechanism that would prevent the recurrence of a serious miscommunication between the FDA and Baxter, such as what occurred in 2010 resulting in the costly May 2010 FDA Recall, Refund, or Replace Order. Lead Counsel negotiated with very experienced and capable counsel, including external counsel Robert Kopecky, and Baxter's in-house lawyer Roibin Ryan, Baxter's Deputy General Counsel. All the

while, Lead Counsel was advised on "best practices" by Professor Sean Griffith, T.J. Maloney Chair in Business Law; Director, Fordham Corporate Law Center of Fordham Law School.

34.     Messrs. Kopecky, Ryan, and Lead Counsel discussed, in depth, ways to meld Plaintiff's proposal calling for a new executive body charged with oversight over high-stakes communications and issues between Baxter and the FDA, with Baxter's existing quality control and compliance structure.  The Parties entered into a confidentiality agreement and pursuant thereto Baxter supplied Lead Counsel with numerous internal corporate quality documents, describing Baxter's current quality control structure.  With the permission of the Defendants and pursuant to the Confidentiality Agreement between the Parties, Lead Plaintiff shared this information with Professor Griffith.  Through these efforts, the Parties were able to agree to the creation of a new corporate office, Regulatory Council, which was described in a Memorandum of Understanding that, with a few minor changes, mirrors the Stipulation of Settlement submitted to this Court.

35.     On March 27, 2014, Baxter announced its plan to spin off in mid-2015 its BioScience business as a separate global healthcare company focused on innovative biopharmaceuticals.  Baxter's Medical Products business will retain the "Baxter" name.  As a result, the Parties amended the Memorandum of Understanding to clarify that the corporate governance reforms would apply solely to Baxter's Medical Products business, after the spin-off of the biopharmaceuticals business.

36.     The Parties did not conduct any discussions as to the payment of attorneys' fees or expenses or incentive payments to Lead Plaintiff prior to having reached an agreement as to the principal terms of the Settlement and the Corporate Governance Reforms.

### F. Special Litigation Committee

37.     As discussed above, on January 20, 2014, Baxter's Board of Directors appointed an SLC to investigate the allegations in the *Westmoreland* action, as set forth in the Seventh Circuit's decision and remand order.

38.     On February 12, 2014, the SLC moved to stay the case in light of its appointment by Baxter's Board of Directors (ECF No. 180), and Lead Counsel responded to this motion to stay on March 7, 2014 (ECF No. 189), requesting a slight modification of the SLC's requested stay.  There was no decision on the motion to stay because the Parties advised the Court that the SLC was evaluating the proposed Settlement and its approval would render the motion to stay moot.

39.     The Settlement negotiated with Baxter's counsel could not be finalized until it was approved by the SLC.  On May 28, 2014, Lead Counsel met with the single Board member on the SLC, Dr. Uma Chowdhry, and her counsel, Chancellor William Chandler (Ret.), currently a partner of Wilson Sonsini Goodrich & Rosati, and other Wilson Sonsini lawyers.  Plaintiff's corporate governance expert, Professor Griffith, attended telephonically for part of the meeting. The participants engaged in a fulsome half-day discussion of the strengths and weaknesses of the Action and the considerable benefits of the Settlement.

40.     After conducting "a thorough and comprehensive factual and legal investigation of the Delegated Claim" (ECF No. 203 at 2), the SLC resolved to approve the Settlement.  ECF No. 203.

### G. Preliminary Approval

41.     On September 9, 2014, Lead Plaintiff filed its Motion for Preliminary Approval of Settlement and supporting documentation.  ECF No. 199.  On September 12, 2014, the Court issued a minute entry requesting that the Parties address three issues: (1) the viability of the

provision of the Parties' Settlement Agreement that purports to permit the Court to retain jurisdiction with respect to the implementation and enforcement of the terms of the Settlement Agreement in light of certain Seventh Circuit case law; (2) additional means of providing notice of the potential settlement to shareholders; and (3) how the Court could assess the Company's compliance with the required expenditure of $4 million per year absent a minimum expenditure requirement. ECF No. 202.

42. The Parties fully addressed these issues in briefing and before the Court at a hearing on September 23, 2014. On September 18, 2014, the SLC filed a statement indicating its approval of the Settlement. ECF No. 203. On September 22, 2014, the Company and the Board of Directors filed additional memoranda in support of the Settlement. ECF Nos. 204, 205. The Parties addressed this Court's well-founded concerns by: (1) eliminating the retention of jurisdiction provision; (2) providing further notice to shareholders via the Company's SEC filings; and (3) amending Exhibit A to the Stipulation to clarify the Company's obligation to spend a *minimum* of $4 million per year to fund new initiatives directed to quality and regulatory compliance.

43. On October 14, 2014, Lead Plaintiff filed a Motion for Preliminary Approval of Settlement (as Revised), ECF No. 207, along with its supporting documentation. The Court granted preliminary approval on October 15, 2014, ECF No. 209, and entered a revised Order Preliminarily Approving Proposed Settlement on November 26, 2014. ECF No. 216.

## IV. SUMMARY OF THE SETTLEMENT AND CORPORATE GOVERNANCE THERAPEUTICS

44. The primary goal of the corporate governance reforms was to create a mechanism whereby the Baxter Board of Directors would be informed and maintain effective oversight over all high-profile matters between Baxter's Medical Products business and its principal regulator,

the FDA. A secondary goal was that the decision-making over such regulatory matters be coordinated in a discrete committee of key executives who would be insulated from business incentives of Baxter and accountable primarily to a committee of Baxter's Board of Directors.

45. The corporate governance reforms (set out in Exh. A to the Stipulation) achieves both goals. Furthermore, it is consistent with Baxter's model of antitrust and employment compliance where overarching responsibility for such compliance is maintained in a discrete Corporate Responsibility Office. The Settlement calls for Baxter's creation of a new office – Regulatory Council ("RC") – that is charged with maintaining close oversight of Baxter Medical Products' interactions with the FDA concerning key matters that could result in substantial penalties or adverse rulings.

46. The matters which must come before the RC are clearly delineated – these include any Consent Decree, any FDA warning letter, and any Form 483 "investigational observation" letter if the Form 483 reveals a persistent problem. This removes the more mundane issues between Baxter Medical Products and the FDA from the RC's jurisdiction and allows it to focus on issues of critical concern to the Company. The RC must keep track of the status of all the regulatory matters within its jurisdiction.

47. The RC is comprised of the three senior-most executives in the Company for: (i) regulatory affairs; (ii) quality compliance; and (iii) in-house counsel responsible for FDA regulatory law.

48. The RC's independence is structurally assured. It will report directly to the Public Policy Committee of the Board of Directors and not to any business division head. It is responsible for reporting to this Committee: (i) key risk areas for the Company's quality program; and (ii) the status of the Company's compliance with all FDA regulatory mandates that

have been identified in ¶46. This reporting must occur at a minimum of twice each year for the first two years of the RC's existence.

49.     The responsibilities of the Public Policy Committee of the Baxter Board of Directors will be amended to expressly encompass review of the Company's efforts to comply with key FDA mandates, including consent decrees, warning letters, and persistent §483 violations.

50.     The RC is responsible for updating the training provided to both the Company's Regulatory and Quality leadership regarding FDA priorities and initiatives.

51.     If there is an actual or potential crisis involving an FDA issue – such as most clearly would have been the case with regard to the Colleague Pump remediation effort prior to the FDA's May 2010 Order – the RC is guaranteed a "seat at the table of the crisis management team" and is authorized to appoint additional personnel to manage the crisis.

52.     The RC will be given the financial and informational wherewithal to carry out its responsibilities:

- Their duties, responsibilities, and composition will be maintained on the Baxter employee intranet.

- They will be authorized to obtain "advice and assistance" from both internal and external advisors.

- They will periodically make recommendations regarding the sufficiency of staff levels within the RC organization, and the adequacy and effectiveness of the Company's quality training manuals and policies set forth in the Corporate Quality Manual.

53.     Importantly, Baxter has committed to keep the RC in place for a minimum of three years and to fund it in a minimum amount of $4 million per year to enable it to set up and run its new quality and regulatory compliance initiative.

## V.    THE STRENGTHS AND WEAKNESSES OF THE CASE

54.    Based on the publicly available documents and discovery obtained, Lead Plaintiff believes that it had uncovered and would continue to uncover, substantial evidence to support its claims.  Lead Plaintiff also realized, however, that it faced considerable risks as the case proceeded.  These risks were carefully considered in evaluating whether the Settlement was in the best interests of Baxter and the shareholders.

55.    In this regard, Defendants' motion for summary judgment asserts as an undisputed fact that the Baxter Board of Directors never stopped trying, in good faith, to remedy the Colleague Pump to the FDA's requirements.  For example, Defendants argued that Lead Plaintiff would be unable to prove that defendant Board members knowingly refused to comply with the FDA's timetable or requirement that the safety and efficacy of the Colleague Pump be proven by a clinical trial.

56.    Another separate risk to the success of this Action was the Defendant's appointment of an SLC to investigate the alleged misconduct.  If Lead Plaintiff did not settle the Action, the Court would most likely have stayed the Action to give the SLC reasonable time to complete its investigation.  *In re InfoUSA, Inc. S'holders Litig.*, C.A. No. 1956-CC, 2008 WL 762482 (Del. Ch. Mar. 17, 2008).  The SLC found no indication that the Board, or any of the Company's officers, made a deliberate decision to cease the Company's efforts to comply with the 2006 Consent Decree at any point from the beginning of 2008 through the end of 2010, and thus determined that the claim "that from late November 2008 through May 4, 2010, the board consciously caused Baxter to cease its efforts to comply with the 2006 Consent Decree (*i.e.*, 'threw in the towel')" had no merit.  Even if the SLC had found an indication of culpability on the part of directors or executives, it nonetheless could have determined to not pursue the litigation.  SLCs are charged with balancing the cost and disruption of litigation with the always

18

uncertain upside of a successful prosecution. It would be extremely difficult for Lead Plaintiff to successfully challenge such a decision by an independent SLC, because it would be accorded great deference under the business judgment rule. *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

## VI. THE SETTLEMENT IS IN THE BEST INTERESTS OF BAXTER AND ITS SHAREHOLDERS

57. Having considered the foregoing strengths and weaknesses of the claims, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating shareholder derivative actions, that the Settlement of this matter before this Court is fair, reasonable, adequate, and in the best interests of Baxter and its shareholders.

## VII. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

### A. The Combined Fee and Expense Award of $3.9 Million Should Be Awarded Pursuant to the Substantial Benefit Doctrine

58. For the benefits it has achieved for Baxter and its shareholders, Lead Counsel are applying for compensation of attorneys' fees and expenses, all inclusive, in the amount of $3.9 million. Courts throughout the country and in this district recognize that a substantial non-monetary benefit for the nominal defendant corporation achieved through corporate governance reforms, entitles plaintiffs' counsel in a shareholder derivative action to a fee award.

59. Professor Griffith valued the corporate governance therapeutics conservatively, at between $50 million and $60 million, by determining that the corporate trauma visited upon Baxter by the FDA's May 2010 Order (which cost the Company $588 million) would be at least 10% less likely to occur in the future due to the corporate governance reforms put in place by the Settlement.

60.     It is my expectation, given the rigor with which the Parties negotiated this Settlement, the expertise brought to bear by Professor Griffith's valuable assistance, and the care the Parties took to integrate the RC into Baxter's existing compliance structure, that the compliance regime described in the Settlement will succeed in reducing the risk of corporate trauma by far more than 10%.

**B.     The Common Fund Doctrine from Which the Substantial Benefit Doctrine Is Derived Also Supports the Combined Fee and Expense Award of $3.9 Million**

61.     While the minimal $12 million funding of the RC over the next three years called for in the Settlement is not a true common fund in that obviously the monies are not disbursed to a class, it nevertheless bears some similarities to a common fund case. As such, the payment of $3.9 million (slightly less than 1/3 of the total funding of the RC) is well within the range of fees generally awarded under the common fund doctrine in this Circuit. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011) (collecting cases and stating: "A number of fee awards in common-fund cases from within the Seventh Circuit show that an award of 33.3% of the settlement fund is within the reasonable range."); *Goldsmith v. Tech. Solutions Co.*, No. 92 C 4374, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) (collecting cases and stating: "where the percentage method is utilized, courts in this District commonly award attorneys' fees equal to approximately one-third or more of the recovery").

**C.     The Fees Are Justified by the Market Rate Theory and in Other Similar Cases**

62.     As discussed above, the agreed-to amount of $3.9 million for all fees and expenses incurred by Lead and Liaison Plaintiffs' Counsel was not negotiated until after the corporate governance reforms were settled.

63.     The fee was not arbitrarily picked.  It was the product of hard negotiations which were conducted at arm's-length through multiple telephone conversations and between experienced counsel on both sides.  Not surprisingly, Lead Plaintiff's initial demand was higher and Defendants' initial offer was lower than the amount finally agreed upon.  In a very real sense, the compromise, all-inclusive amount of $3.9 million for fees and expenses reflects the give and take of the market where both Parties were well represented.

64.     While described in more detail in the Memorandum in Support of Plaintiff's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Award to Lead Plaintiff, the fee and expense amount of $3.9 million is comparable to other similar attorney fee awards for corporate reforms.  *See, e.g.*, *In re Abbott-Depakote S'holder Deriv. Litig.*, No. 11 C 8114, Final Order and Judgment (ECF No. 332 at 9) (N.D. Ill. May 22, 2014) (award of $9.9 million for corporate governance reforms of a pharmaceutical company); *In re Schering-Plough Corp. S'holders Deriv. Litig.*, No. CIV.A. 01-1412, 2008 WL 185809, at *5 (D.N.J. Jan. 14, 2008) ($9.5 million fees and $300,000 expenses for corporate governance reforms of a pharmaceutical company arising from FDA issues).

### D.     The Requested Fees Are Also Fair and Reasonable Under the Lodestar Methodology

65.     Here Lead Counsel and Liaison Counsel collectively expended over 2,870 hours prosecuting this case for a total lodestar of $1,771,222.50.  *See* the Declaration of Daryl F. Scott ("Scott Decl."), ¶4 and Declaration of Michael J. Freed ("Freed Decl."), ¶6 filed concurrently herewith.  Together the firms expended $71,493.94, and anticipate expending approximately $3,500 for Lead Counsel's attendance at the Final Approval Hearing on February 27, 2015.  Therefore, the total in fees and expenses incurred by Lead and Liaison Counsel is $1,846,216.44,

and the Fee and Expense Award of $3.9 million represents a modest multiplier of approximately 2.11, falling well within the range of reasonableness.

66.    As has been discussed throughout this Declaration, the risk of this contingent Action has been great, as evidenced by the fact that Defendants' motions to dismiss were granted by this Court.  It was diligently prosecuted and is a complex case that has been vigorously opposed by extremely capable counsel, from three firms:  Mr. Robert Kopecky, partner at Kirkland & Ellis LLP, represented Baxter; Mr. Matthew Kipp, partner at Skadden, Arps, Slate Meagher & Flom LLP, represented the Individual Defendants; and William Chandler, former Chancellor of Delaware Chancery Court, and partner at Wilson Sonsini, represented the SLC.

67.    Lead Counsel, Scott+Scott, is a national law firm specializing in securities and antitrust class actions, shareholder derivative actions, and other complex class cases.  *See* Exh. A to Scott Decl.  The record in this case, along with the matters described in this Declaration, demonstrates the enormous effort and expense that went into successfully resolving this litigation.

68.    For all the above reasons, Lead Counsel request that the agreed-to attorneys' fee and expense amount of $3.9 million be awarded by this Court.

## VIII.   LEAD PLAINTIFF REQUESTS THAT AN INCENTIVE AWARD OF $15,000 BE APPROVED

69.    As the Declaration of Jeffrey Balzer points out, Lead Plaintiff Westmoreland has "lived with" this Action for more than four years.  It has honored its commitment to retain ownership of shares of Baxter until the conclusion of the litigation and has actively overseen the work of Lead Counsel since the inception of the case.

70.    Moreover, there have been many junctures in this Action where Westmoreland's active participation was required: at the §220 books and records stage, the two verified

complaints, the decision to take an appeal, and especially during settlement negotiations. Westmoreland understood its responsibilities as a shareholder derivative plaintiff and faithfully met them.

71. The requested Incentive Award is well within the amount commonly requested, especially since the Action has been actively prosecuted, requiring Westmoreland's attention for over four years.

72. For all the foregoing reasons, Lead Plaintiff and Lead Counsel respectfully request that the Court award the $15,000 Incentive Award that was agreed to by Defendants.

## IX. CONCLUSION

73. For all the foregoing reasons, Lead Counsel respectfully requests that the Court approve the Settlement and award Lead Counsel's $3.9 million Fee and Expense Award and Lead Plaintiff's $15,000 Incentive Award, which is to be paid from, not in addition to, the Fee and Expense Award.

I declare under penalty and perjury of the laws of the United States of America, that the statements made above are true and correct to the best of my knowledge. Executed this 23rd day of January, 2015.

Respectfully submitted,
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP

*/s/ Judith S. Scolnick*
Judith S. Scolnick